IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JUSTIN HUNT,<br><br>            Plaintiff,<br><br>      vs.<br><br>MICHAEL ASTRUE, Commissioner of<br>Social Security,<br><br>            Defendant. | **MEMORANDUM DECISION & ORDER**<br><br>Case No: 2:08-CV-176 DN<br><br><br>Magistrate Judge David Nuffer |

Plaintiff Justin Hunt filed suit seeking judicial review of the decision of the Commissioner denying his applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.[1]  The case is before the magistrate judge by consent of the parties under 28 U.S.C. § 636(c).  After a careful review of the entire record and the parties' submissions, the magistrate judge concludes that the decision of the Commissioner should be affirmed.

**PROCEDURAL HISTORY**

Hunt applied for benefits on September 24, 2004[2] (protective filing date) alleging that he became unable to work on July 30, 2004[3] due to a back problem.[4]  Hunt's applications were

---

[1] 42 U.S.C. §§ 401-433, 1381-1383f.

[2] Tr. 20, 82-84, 346-49.

[3] Tr. 82, 346.

[4] Tr. 109.

denied initially,[5] and on reconsideration.[6]  Hunt then obtained a hearing before an Administrative Law Judge (ALJ) which was held March 9, 2007.[7]  In a written decision, the ALJ determined that Hunt was not eligible for benefits because he was capable of performing jobs that exist in significant numbers in the national economy.[8]  The Appeals Council denied Hunt's request for review, making the ALJ's decision the final decision of the Commissioner.[9]

## SUMMARY OF EVIDENCE

Hunt was twenty-seven years old at the alleged disability onset date.[10]  He had an eleventh-grade education,[11] and had worked as a shop foreman, "service wrighter," trailer technician, and truck technician at a truck shop.[12]

## A.  Evidence at the Administrative Hearing

### 1.  Hunt's Testimony

Hunt testified that his last job was a shop foreman/service writer.  That job ended when he pulled a tendon in his arm and could not do much heavy lifting.  He had to be on light duty for longer than ninety days which was all the company allowed.[13]  In addition to the arm injury,

---

[5]Tr. 53-55.

[6]Tr. 57-59.

[7]A transcript of the hearing may be found in the administrative record at pages 350-405.

[8]Tr. 46.

[9]Tr. 4-6.

[10]Tr. 43.

[11]Tr. 115.

[12]Tr. 101.

[13]Tr. 356.

he also had problems with his back, dizziness, and his sinuses.[14]  Following that job, Hunt tried

working part-time at a sporting goods store, but left after about three days.  The job required

bending and lifting guns and climbing a ladder which was too much physical activity for him.[15]

After stopping work, he spent most of his time in a reclined position on the couch

watching TV.[16]  Although he seldom left the house, he occasionally would go for a ten-minute

walk to get some air.  Sometimes he would make a ten- or fifteen-minute trip to the store to buy

bread and milk.[17]  He testified that the longest he could be away from home was ten to fifteen

minutes.[18]  He had a problem with dizziness which he stated was caused by his sinuses.  He had

sinus surgery to remove a polyp, but his condition was worse after the surgery.  He stated that he

lost a prior job because of the dizziness and his back problem.[19]

The ALJ observed that Hunt's records revealed some mental and emotional problems.

The ALJ asked which were worse in 2005, the physical problems or the mental problems.  Hunt

stated that the physical problems caused a lot of the mental problems.  However, he had always

had a "bad anxiety problem," and had been to the emergency room "several times, countless

[14]Tr. 356-57.

[15]Tr. 357.

[16]Tr. 363.

[17]Tr. at 364.

[18]Tr. 364-65.

[19]Tr. 365.

times for anxiety attacks."[20]  But in 2005, Hunt's physical problems were definitely worse than his mental problems.[21]

Regarding his activities, Hunt stated that about once every other month, he went to Wal-Mart.[22]  The longest period he had spent away from home in the past year was a visit to his grandmother's for Christmas–a period of four or five hours that he spent reclining on the couch.[23]

Hunt said that he spent most of his time lying on the couch watching movies or looking at his coin magazines.[24]  He also tried to help his eleven-year-old sister with homework, but he was not much help.[25]  He did not do any cooking or housework.  He did throw his blanket in the washer a couple of times, but his mother took care of it after that.[26]  He did not even go out for a haircut because his mother cut his hair.[27]

He spent about fourteen hours a day watching television.[28]  About every two hours when he got up to go to the bathroom, he would walk around the house for a couple of minutes to keep blood clots from forming in his legs.[29]

---

[20]Tr. 369.

[21]Tr. 369.

[22]Tr. 370-71.

[23]Tr. 371.

[24]Tr. 372.

[25]Tr. 372-73.

[26]Tr. 373.

[27]Tr. 373-74.

[28]Tr. 374.

[29]Tr. 374-75.

On the day before the hearing, Hunt got up about 9:00, but he just reclined on the couch watching TV.[30]  When he woke up, his pain was at a level seven on a scale of one to ten. Towards the evening, the pain got worse and his legs were really aching.[31]  He spent about 95% of the day lying down watching TV.[32]

He took oxycontin and oxycodone for pain.[33]  After taking the medication, his level of pain would drop from a level eight to about a four or five.[34]  Hunt has had pain since falling twelve feet into a hole or well when he was eleven or twelve years old.  He stated that he suffered a slight skull fracture.[35]

On examination by his attorney, Hunt stated that he continues to suffer from dizziness because of his sinuses.[36]  The dizziness sometimes causes him to fall, although less often since he has been on medication.  The last fall occurred in the shower about a month before the hearing. Because of his difficulties, he only takes a shower about once a week.  He is able to stand during his shower, even though it lasts about thirty to forty minutes. [37]

---

[30]Tr. 376.

[31]Tr. 378.

[32]Tr. 379.

[33]Tr. 379-81.

[34]Tr. 381.

[35]Tr. 384.

[36]Tr. 385-86.

[37]Tr. 386.

Hunt stated that he does not drive except when it is absolutely necessary.[38]  His doctors have told him not to drive because of his dizziness and medications which make him drowsy and affect his memory and concentration.[39]

Hunt described an ATV accident in which he injured his back and neck.[40]  He stated that he has also dislocated his ribs three times.[41]  Hunt's attorney observed that Hunt was trembling and asked what it was from.  Hunt replied, "It's hurting."[42]  The pain made him feel nauseated.  He also suffered from irritable bowel syndrome which caused some urgency in getting to the bathroom.[43]

On reexamination by the ALJ Hunt stated that in a typical day, his worst pain was in his back and sinus.[44]  His back pain extends from just above the belt all the way down one or both legs to the toes.  Hunt stated that he would not try to change a light bulb because reaching overhead would increase his pain.[45]  He testified that his pain level had gone up a little (from an eight to an eight and a half) during the hearing which had lasted approximately one hour and ten minutes.[46]

---

[38]Tr. 387.

[39]Tr. 388.

[40]Tr. 389.

[41]Tr. 390-92.

[42]Tr. 392.

[43]Tr. 392-93.

[44]Tr. 393.

[45]Tr. 394.

[46]Tr. 394-95.

Hunt testified that presently he could sit for ten minutes, stand for about five to ten minutes, and walk for around ten minutes.[47]  He could lift about ten pounds.  When he sits, stands, or walks too long, or lifts too much, it increases the pain in his back and legs.[48]  Regarding the side effects of his medications, Hunt stated that they contribute to tiredness, dizziness, weakness, light-headedness, and nausea.[49]

### 2. Testimony of the Vocational Expert

A vocational expert (VE) testified at the hearing by telephone.  The ALJ asked a hypothetical question concerning an individual with Hunt's vocational characteristics, and the ability to do a limited range of sedentary, unskilled work.[50]  In response, the VE testified that the hypothetical individual would not be able to perform any of Hunt's past relevant work because his past work had all been at the light and medium exertional levels.  However, the individual would be able to perform the jobs of nut sorter, dowel inspector, and addresser, which exist in significant numbers in the national economy.[51]

### B.  Medical Evidence Relating to Physical Impairments

### 1.  Matthew Peterson, D.C.

Dr. Peterson, a chiropractor, reported that he had treated Hunt since October 17, 2000 for low back pain and pain into the legs.  Dr. Peterson noted that Hunt came in when he could afford

---

[47]Tr. 395-96.

[48]Tr.  397.

[49]Tr. 398.

[50]Tr. 399-401.

[51]Tr. 401-02.

it, because he had no insurance.[52]  Dr. Peterson's diagnosis was degenerative disc disease,

radiculitis, and myofascial pain syndrome.  Dr. Peterson indicated that Hunt's condition was

static, but could be improved with ongoing treatment.[53]  Dr. Peterson stated that Hunt should not

engage in excessive bending or lifting, but could do fine or gross movements if not prolonged.

Dr. Peterson recommended continued chiropractic care, possible physical therapy, and an MRI

to rule out spinal canal stenosis.[54]

### 2.  David K. Palmer, M.D.

Dr. Palmer performed sinus surgery on July 14, 2003.  He certified that Hunt was able to

return to work on August 13, 2003.[55]  In the year following the surgery, Hunt complained of

pain, pressure and other symptoms.  He was treated with various medications[56]  On August 26,

2004, Dr. Palmer's office notes reflect that Hunt's mother had called stating that he was in a lot

of pain and wanted pain meds.  It was discussed at length that no narcotics would be given for

Hunt's sinus pain.[57]

### 3.  John F. Bermen, M.D.

In November 2003, Hunt was referred to Dr. Bermen for evaluation and treatment of an

elbow injury he sustained at work on October 28, 2003.  Dr. Bermen's impression was

---

[52]Tr. 147.

[53]Tr. 146.

[54]Tr. 146.

[55]Tr. 156.

[56]Tr. 151-55.

[57]Tr. 151.

    1.  Lacertus fibrosis tear.
    2.  Partial biceps tendon tear.

Dr. Bermen prescribed Naprosyn for inflammation and Lortab for pain.  Hunt was to continue wearing a sling and was not to use his left arm.[58]

Hunt's injury continued to improve and on March 15, 2004, Dr. Bermen released him to return to lifting.  Dr. Bermen noted that Hunt's previous occupation required heavy lifting over 100 pounds.  Dr. Bermen stated that "he can either return to his previous occupation or choose to find alternative employment that does not require so much heavy lifting."[59]

On March 29, 2004, Dr. Bermen wrote a letter to Liberty Mutual Group stating that Hunt "may be considered at maximal medical improvement on this date."[60]  Dr. Bermen stated that Hunt's impairment "would equal a 1% impairment of the upper extremity and 1% whole person impairment."[61]  Dr. Bermen recommended continued treatment with the anti-inflammatory Naprosyn[62]

A letter, dated June 10, 2004, from Dr. Bermen to Liberty Mutual Group indicates that he saw Hunt for a recheck of his left elbow.  Dr. Bermen stated that Hunt was still having some aching and problems with heavy lifting.  Dr. Bermen recommended "something lighter that does not involve repetitive heavy lifting."  Hunt should remain on Naprosyn indefinitely.[63]

---

[58]Tr. 326-27.

[59]Tr. 319.

[60]Tr. 318.

[61]Tr. 318.

[62]Tr. 318.

[63]Tr. 314.

### 4.  Timothy S. Grange, M.D., Greg Powell, PA-C

In October 2004, Hunt saw Dr. Grange and Mr. Powell on referral from Dr. Peterson.

Dr. Grange's assessment was as follows:

1.    Low back pain radiating to the right greater than the left lower extremity.
      He also has some lower thoracic pain.

2.    Delayed return to productive employment and he does not seem to be
      pursuing some available options for uncertain reasons.

3.    History of sinus surgery, which he says did not work very well.[64]

Dr. Grange recommended an MRI of the low back, a gentle stretching and exercise program,

consideration of corticosteroid injection depending upon the MRI results, and pursuit of

educational and training options.[65]   Dr. Grange explained to Hunt his concerns about "his

persistent use of Lortab since it did not appear to be helping his pain or function significantly

and because of potential risks."[66]   Regarding work, Dr. Grange recommended "[l]ight duty with

no lifting over approximately 10 pounds and no repetitive bending.  Allow some change of

positions."[67]

### 5.  Milan Djurich, D.O.

Dr. Djurich began seeing Hunt for his low back pain on November 11, 2004.  On

examination, Hunt had tightness in the lumbar area with flexion and bending to the left, no

sensory loss, 5/5 strength in the lower extremities, and pain with palpation in the lumbosacral

---

[64]Tr. 159.

[65]Tr. 159.

[66]Tr. 160.

[67]Tr. 160.

region.  Dr. Djurich's assessment was low back pain with sacroiliac joint sprain/strain, and

muscle spasms of the right lumbar area.  He noted that there had not been adequate investigation

of the low back pain and a cause had not been determined.[68]  On November 18, 2004, Dr. Djurich

noted that he needed to obtain medical records from other physicians in order to establish an

accurate diagnosis.[69]  Over the course of their relationship, Dr. Djurich treated Hunt with various

pain medications.[70]

On September 23, 2005, Dr. Djurich saw Hunt for followup of his chronic low back pain.

Hunt's pain had not changed since his last visit on April 28, 2005.  Dr. Djurich noted that

"[W]ith pain medications on board, he is walking without a limp."[71]  There was no sensory

deficit.  Dr. Djurich also noted the results of Hunt's MRI.  Dr. Djurich's assessment was Chronic

low back pain, and bulging discs at L4 and L5.  Dr. Djurich believed that "epidural injections

should be helpful."[72]

### 6. Sarah Cormier, FNP-C

Hunt was treated by Nurse Practitioner Cormier beginning in October 2005.[73]  Her

assessments of Hunt are generally very favorable to his disability claim.  On January 23, 2006,

she wrote a letter in support of his claim in which she opined that Hunt "will at no point in his

---

[68]Tr. 238-39.

[69]Tr. 236.

[70]Tr. 223-39.

[71]Tr. 329.

[72]Tr. 329.

[73]Tr. 243.

life be able to sustain employment because of his physical problems."[74]  On January 30, 2007,

Nurse Practitioner Cormier filled out some disability paperwork including a Residual Functional

Capacity Questionnaire in which she indicated that Hunt had significant physical limitations and

was unable to work.[75]  Some of these forms were also signed by Richard E. Anderson, M.D.

### 7.  James Willcox, M.D.

Hunt was evaluated by Dr. Willcox on April 22, 2005 because of complaints of heart

palpitations.  Dr. Willcox stated that Hunt suffers from palpitations with an anxiety component

which made interpretation of his symptoms somewhat difficult.  Dr. Willcox noted that Hunt

was taking atenolol, and had an appointment to see a cardiologist.[76]

### 8.  Emergency Room Visit

On September 12, 2006, Hunt went to the emergency room for sudden low back pain

after bending over.[77]  Examination revealed vertebral tenderness, reduced range of motion, and

positive straight leg raise on the left.  Otherwise, the examination was normal.  He was given an

injection  of morphine and phenergan.  After ten minutes, he stated the shot did not help at all.

The emergency room notes further indicate that he was "up/moving around (unless being

observed)."[78]

---

[74]Tr. 240.

[75]Tr. 241-45.

[76]Tr. 283.

[77]Tr. 332.

[78]Tr. 333.

### 9.  Studies

#### a.  Venous Doppler Bilateral

On May 21, 2005, this study was conducted because of leg pain.  The impression of

James T. Webber, M.D., was "Normal bilateral lower extremity deep venous Doppler."[79]

#### b.  MRI of Lumbar Spine

On August 31, 2005, Hunt had an MRI of the lumbar spine.  Radiologist William J.

Halden, M.D., reported his findings:

IMPRESSION:

1.      Symmetric grade I disk bulge at the L4-5 level appearing to cause some
narrowing of the subarticular recesses bilaterally with what appears to be mild
impingement on the right and left descending L5 nerve roots.  Probable small
annular tear or cleft at the posterior central margin of the disk.
2.      Grade I-II broad based disk bulge at the L5-S1 level which appears to
barely contact the right S1 nerve root without displacing the root.  Mild bilateral
facet arthropathy also present at this level.
3.      There is mild degenerative disk space narrowing at both the L4-5 and L5-
S1 disk.
4.      The other disk levels all appear normal.[80]

#### c.  Cervical Spine

A study of the complete cervical spine on December 29, 2005 showed:  "Normal

radiographic examination of the cervical spine."[81]

---

[79]Tr. 330.

[80]Tr. 221.

[81]Tr. 255, 302.

**C. Medical Evidence Relating to Mental Impairments**

**1. John D. Hardy, Ph.D.**

On January 25, 2005, Dr. Hardy, a clinical psychologist, saw Hunt for a psychological evaluation at the request of the agency. When asked what currently precluded him from working, Hunt responded that it was constant pain in his back and his sinuses. He also reported heart palpitations. He was taking Zoloft for anxiety, and reported that he had gone to the ER twice in 2000 with panic. He also stated that he took five Oxycodone a day. He was adequately groomed and dressed, and was oriented to time, place, person, and situation. He reported some problems with short-term memory. He complained of depression, and appeared significantly depressed during the evaluation. As a hobby, he liked to refinish wooden gunstocks. He had a couple of friends whom he saw often.[82] Hunt's scores on the Mental Control subscale and the Digit Span subscale of the Wechsler Memory Scale suggested that "his ability to pay attention and concentration on the simple number remembering task is in the average range. His performance is a little bit poorer when the complexity of the memory task or attention task becomes slightly more complex."[83]

Hunt was able to do his own grooming and straighten his living space. He reported that he was a good cook, but did not feel like cooking. He sometimes shopped at Wal-Mart, but did not do so often because of back pain.

Dr. Hardy's diagnosis was:

Axis I          Anxiety Disorder NOS.

---

[82]Tr. 176.

[83]Tr. 177.

|  |  |
|---|---|
|  | History of Panic Disorder. |
|  | Depressive Disorder NOS. |
| Axis II | None. |
| Axis III | Back Pain by report, sinus problems, history of heart palpitations and described colon polyps. |
| Axis IV | Deferred. |
| Axis V | Current GAF=65 (depressed mood, sleep problems, but "generally functioning pretty well, has some meaningful interpersonal relationships" from DSM-IV TR).[84] |

Dr. Hardy noted that Hunt's anxiety symptoms appeared to under significant control, although he did appear quite depressed during the evaluation.  Hunt drove only on a limited basis because of his pain medication which demonstrated good judgment.  His intellectual functioning appeared to in the average range, and "his ability to do simple repeating of digits showed his performance to be in the average range reflecting adequate concentrating."[85]  Dr. Hardy stated that Hunt was capable of doing three-step operations.  Challenges to persistence appeared to be primarily related to his back injury.  He was capable of handling his own funds.[86]

## 2. Valley Mental Health

### a. John Byrne, LCSW

Mr. Byrne saw Hunt on January 14, 2005 for a diagnostic interview.  He concluded that Hunt suffered from major depressive disorder, single episode, moderate, and anxiety, not otherwise specified.  He believed that Hunt's current GAF was 50.[87]

---

[84]Tr. 177.

[85]Tr. 178.

[86]Tr. 178.

[87]Tr. 211.

### b.  Michael Reid, M.D.

Hunt was seen on March 17, 2005 by Dr. Reid who believed that Hunt suffered from major depression of moderate severity, generalized anxiety disorder, panic disorder, and possible ADHD.  Dr. Reid estimated that Hunt's current GAF was 35 to 40.  Dr. Reid believed that Hunt's ability to work was "greatly compromised secondary to his psychiatric symptomatology."[88]  Dr. Reid also believed that Hunt had a number of physical problems that would make it difficult for him to work.  Dr. Reid concluded, "I do believe that this individual is unable to work and feel that expediting his paperwork is important."[89]

## DISCUSSION

### A.  Legal Standard

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[90]  The Act further provides that an individual shall be determined to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[88]Tr. 209.

[89]Tr. 209.

[90]42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[91]

A person seeking Social Security benefits bears the burden of proving that because of his disability, he is unable to perform his prior work activity.[92]  Once the claimant establishes that he has such a disability, the burden shifts to the Commissioner to prove that the claimant retains the ability to do other work and that jobs which he can perform exist in the national economy.[93]

The Commissioner's decision must be supported by substantial evidence.[94]  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[95]  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[96]

The Commissioner's findings of fact, if supported by substantial evidence, are conclusive upon judicial review.[97]  In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its judgment for that of the agency.[98]  However, the court should carefully

---

[91] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[92] Miller v. Chater, 99 F.3d 972, 975 (10th Cir. 1996); Nielson v. Sullivan, 992 F.2d 1118, 1120 (10th Cir. 1993).

[93] Saleem v. Chater, 86 F.3d 176, 178 (10th Cir. 1996); Miller, 99 F.3d at 975.

[94] Daniels v. Apfel, 154 F.3d 1129, 1132 (10th Cir. 1998); Hinkle v. Apfel, 132 F.3d 1349, 1351 (10th Cir. 1997).

[95] Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

[96] Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992); Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991).

[97] 42 U.S.C. §§ 405(g), 1383(c)(3); Perales, 402 U.S. at 390.

[98] Hinkle, 132 F.3d at 1351; Decker v. Chater, 86 F.3d 953, 954 (10th Cir. 1996).

examine the record and review it in its entirety.[99]  Failure of the Commissioner to apply the correct legal standard is grounds for reversal.[100]

The Commissioner has established the following five-step process for determining whether a person is disabled:

(1)    A person who is working is not disabled.  20 C.F.R. § 416.920(b).

(2)    A person who does not have an impairment or combination of impairments severe enough to limit his ability to do basic work activities is not disabled.  20 C.F.R. § 416.920(c).

(3)    A person whose impairment meets or equals one of the impairments listed in the "Listing of Impairments," 20 C.F.R. § 404, subpt. P, app. 1, is conclusively presumed to be disabled.  20 C.F.R. § 416.920(d).

(4)    A person who is able to perform work he has done in the past is not disabled.  20 C.F.R. § 416.920(e).

(5)    A person whose impairment precludes performance of past work is disabled unless the Secretary demonstrates that the person can perform other work available in the national economy.  Factors to be considered are age, education, past work experience, and residual functional capacity.  20 C.F.R. § 416.920(f).[101]

## B.  The ALJ's Decision

The ALJ performed the sequential analysis, finding as follows:  (1) Hunt has not engaged in substantial gainful activity since the alleged onset date of disability;[102] (2) he has severe

---

[99]*Musgrave*, 966 F.2d at 1374; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

[100]*Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351.

[101]*Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

[102]Tr. 22.

impairments including "lumbar radiculopathy, anxiety, and depression;[103]" (3) he does not have an impairment or combination of impairments that meet or equal the listings;[104] (4) he is unable to perform his past relevant work;[105] but (5) he is capable of performing jobs that exist in significant numbers in the national economy.[106]  Examples of jobs that the ALJ found Hunt could perform include dowel inspector, nut sorter, and addresser.[107]  Based on these findings, the ALJ concluded that Hunt was not disabled as defined by the Social Security Act.[108]

## C.  Hunt's Arguments

In support of his disability claim, Hunt argues that the (1) the ALJ's analysis of the medical opinions is not supported by substantial evidence; and (2) the ALJ failed to properly assess Hunt's Residual Functional Capacity.  At the outset, the court notes that Hunt argues throughout his memorandum that the ALJ's opinion is insufficient to allow this court to make a meaningful review because of the ALJ's alleged failure to cite specific evidence to support his conclusions.  Hunt contends that the case should therefore be remanded to allow the ALJ to adequately explain his findings.

---

[103]Tr. 22.

[104]Tr. 32.

[105]Tr. 43.

[106]Tr. 44.

[107]Tr. 44.

[108]Tr. 46.

The court finds this argument to be without merit.  The ALJ is not required to discuss every piece of evidence in the record.[109]  Contrary to Hunt's assertions, the ALJ thoroughly discussed the medical evidence and provided a meaningful analysis of the medical opinions. The Tenth Circuit has rejected a construction of the case law that "based on a reading of the ALJ's decision as a whole, would lead to unwarranted remands needlessly prolonging administrative proceedings."[110]

## D.  Analysis of Medical Opinions

The ALJ is required to give controlling weight to the opinion of a treating physician so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record.[111]  "An ALJ may disregard a treating physician's opinion, however, if it is not so supported."[112]  In all cases, the regulations require that the ALJ "give good reasons" in his decision for the weight that he gave to the treating physician's opinion.[113]

If a treating source opinion is not entitled to controlling weight, it is still entitled to deference,[114] and must be weighed using the following factors:

---

[109]*Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

[110]*Wall v. Astrue*, No. 06-1029, ___ F.3d ___, 2009 WL 522867, at *17 (10th Cir. Mar. 3, 2009)(quoting *Fischer-Ross v. Barnhart*, 431 F.3d 729, 730 (10th Cir. 2005)).

[111]*Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).

[112]*Doyal*, 331 F.3d at 762; *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994).

[113]*Doyal*, 331 F.3d at 762; *Hamlin*, 365 F.3d at 1215.

[114]*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004).

> (1) the length of the treatment relationship and the frequency of examination;
> (2) the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to
> which the physician's opinion is supported by relevant evidence; (4) consistency
> between the opinion and the record as a whole; (5) whether or not the physician is
> a specialist in the area upon which an opinion is rendered; and (6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.[115]

Hunt contends that the ALJ's analysis of the medical opinions is insufficient.  In

particular, he argues that the ALJ failed to provide adequate reasons for the weight given the

opinions of his treating physician, Dr. Djurich, his psychiatrist, Dr. Reid, and Nurse Practitioner

Cormier.

### 1.  Opinions of Dr. Djurich and Nurse Practitioner Cormier

In regard to Dr. Djurich, Hunt apparently is referring to an RFC questionnaire signed by

Dr. Djurich on April 7, 2005.  Dr. Djurich stated that Hunt's diagnosis was low back pain with

radiculopathy.  With regard to prognosis, Dr. Djurich stated that Hunt had a chronic problem

which might need surgical evaluation.  Hunt's symptoms included pain in the lower back,

radicular pain with exertion, coughing and sneezing, and with prolonged time in one position.

Dr. Djurich checked a box indicating that Hunt's symptoms would "often" interfere with

attention and concentration.  He also noted that the side effects of Hunt's medication may cause

impaired mentation.  With regard to Hunt's functional limitations, Dr. Djurich indicated that he

could walk three blocks without resting or severe pain; could sit for 45 minutes at a time; and

stand for 10 minutes.  He also indicated that Hunt would need to lie down 2 hours each day.

However, in the very next question, Dr. Djurich indicated that Hunt would need to lie down a

---

[115]*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)(quoting *Goatcher v. United States Dep't of HHS*, 52
F.3d 288, 290 (10th Cir. 1995)); *accord Robinson*, 366 F.3d at 1082.

total of at least 6 hours in an 8-hour workday.[116]  Dr. Djurich further indicated that Hunt would

need a job in which he could shift positions and that he would need to take unscheduled breaks

every 15 to 20 minutes.  Hunt would be able to lift less than 10 pounds frequently, and 20

pounds occasionally.  He would have no significant limitations in reaching, handling, or

fingering.  However, he would likely be absent from work more than four times a month.[117]

The ALJ concluded that the RFC opinion of Dr. Djurich was not entitled to controlling

weight because it was inconsistent with Hunt's testimony, Dr. Djurich's own treatment records

and opinions, with the other medical evidence, with Hunt's self-reporting on forms submitted in

support of his claim, and with the findings of the state agency.  Having determined that Dr.

Djurich's opinion was not entitled to controlling weight, the ALJ then evaluated the opinion for

persuasiveness.  In addition to the inconsistencies between Dr. Djurich's opinions and the other

evidence noted above, the ALJ noted that Dr. Djurich's opinions were unsupported by the

record, did not reflect familiarity with the disability program or with the rest of Hunt's case

records, and were on issues reserved to the Commissioner.  For those reasons, the ALJ

concluded that Dr. Djurich's opinions were entitled to little weight.[118]

Hunt contends that the ALJ's statement is conclusory and does not provide enough detail

for the court to review the ALJ's decision.  As previously noted, the court finds that the ALJ's

conclusions are supported by substantial evidence in the record and in the ALJ's opinion itself.

As the ALJ stated, Dr. Djurich's own opinions were inconsistent.  For example, on March 3,

---

[116]Tr. 225.

[117]Tr. 226.

[118]Tr. 39.

2005, approximately one month before Dr. Djurich completed the RFC assessment at issue, he

filled out a form for the Department of Workforce Services (DWS).  On that form, Dr. Djurich

indicated that Hunt could gradually increase to full-time work by June.  Dr. Djurich stated "I still

don't know what the problem is." He added that he needed an MRI to find out what the problem

was and to make a definitive decision, noting that Hunt might need injections or surgery.[119]

Thus, the March form, which indicated Hunt would be capable of full-time work in June, was

clearly inconsistent with the form completed by Dr. Djurich in April which included such

extreme limitations as needing to lie down for six hours a day.  There is nothing in the record

that would explain this change in Dr. Djurich's opinion.  As the Commissioner points out, the

MRI of Hunt's spine was not completed until August 2005, after Dr. Djurich filled out the RFC

questionnaire, so the MRI could not have been the basis for the change.  The ALJ also noted the

inconsistency within the RFC questionnaire itself in which Dr. Djurich stated that Hunt would

have to lie down for two hours a day, and later stated that he would have lie down for six hours a

day.[120]

　　　　In his reply memorandum, Hunt also takes issue with the ALJ's rejection of the opinion

of Nurse Practitioner Cormier.  In his opinion, the ALJ noted that while a nurse practitioner is

not an "acceptable medical source" under the regulations,[121] a nurse practitioner does qualify as

an "other source" whose opinions may be considered.[122]  However, the opinion of an "other

---

[119]DWS form (Tr. 230); ALJ decision (Tr. 36.)

[120]Tr. 36.

[121]Tr. 39; see 20 C.F.R. §§ 404.1513(a), 416.913(a).

[122]Tr. 39; see 20 C.F.R. §§ 404.1513(e), 416.913(e).

source" is not entitled to as much weight as that of an "acceptable medical source."[123]   The ALJ stated that although Nurse Cormier had "shared her opinions rather extensively," her opinions were generally inconsistent with those of acceptable medical sources which were entitled to greater weight.   The ALJ stated that Ms. Cormier's opinions are "extreme overstatements" which, if believed, would render the claimant incapable of such activities as making a trip to the bathroom or sitting up to eat dinner.[124]   The ALJ noted that Hunt does exercises for his back, takes showers lasting 30 to 45 minutes, flies remote control airplanes, drives, visits his father, and goes to the store.[125]   Finally, the ALJ observed that Ms. Cormier's opinion that Hunt would not be able to work for the rest of his life addresses an issue reserved to the Commissioner and is entitle to no weight.[126]

In his reply, Hunt states that there are two flaws in the ALJ's evaluation of Ms. Cormier's opinion.   First, the ALJ incorrectly focused on the "extreme overstatements" of Ms. Cormier, but failed to point out what weight was given to other parts of her opinion.   He states that the parts of her opinion which comport with those of Dr. Djurich should be given some weight.   Second, and most important in Hunt's view, is the ALJ's failure to recognize that "a medical doctor approved and signed off on [the opinions], thereby rendering the ALJ's criticism of her as [a] non-approved medical source legally unreasonable."   Hunt contends that the ALJ's

---

[123]Tr. 39 (citing *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

[124]Tr. 39-40.

[125]Tr. 40 (citing a form filled out by Hunt, tr. 125-27).

[126]Tr. 40.

failure to give more weight to the limitations expressed by Ms. Cormier constitutes legal error requiring remand.[127]

With regard to the first argument, the ALJ said he gave <u>no weight</u> to the opinion of Ms. Cormier. The ALJ gave legitimate reasons for this determination. Thus, the contention that the ALJ should have explained what weight he gave to those parts of Ms. Cormier's opinion that did not constitute "extreme overstatements" is without merit. Turning to the second argument, it is true that a Dr. Richard Anderson signed the forms completed by Ms. Cormier. However, it is clear that Ms. Cormier is the person who filled out the forms, and that they contained her opinions. Further, there is nothing in the record to suggest that Dr. Anderson ever saw or treated Hunt. However, even if Dr. Anderson were a treating physician who agreed with, and signed off on the opinions of Ms. Cormier, the opinions at issue would still be subject to rejection for the reasons stated by the ALJ.

As the ALJ also noted, the opinions of Dr. Djurich and Nurse Cormier were inconsistent with other medical evidence in the record. The ALJ gave controlling weight to the opinion of Dr. Grange, whom the ALJ considered to be a treating physician.[128] As discussed, Dr. Grange recommended light-duty work with no lifting over approximately 10 pounds and no repetitive bending, and which would allow for a change of positions.[129] Dr. Grange's opinion was consistent with that of Dr. Peterson, Hunt's treating chiropractor, which the ALJ also accorded

---

[127]Plaintiff's Reply Brief (Reply) at 5, docket no. 17, filed August 22, 2008.

[128]Tr. 36, 39.

[129]Tr. 160.

significant weight.[130]   For example, the only limitations imposed by Dr. Peterson were no

excessive bending or lifting and no prolonged fine or gross movements.[131]   Dr. Grange's opinion

was also consistent with the opinions of the reviewing physicians who found that Hunt was

capable of light work that required no more than occasional balancing, stooping, and

crouching.[132]

### 2.  Opinion of Dr. Reid

Regarding the opinion of Dr. Reid, the ALJ acknowledged that Dr. Reid believed that

Hunt's ability to work was "greatly compromised secondary to his psychiatric

symptomatology."[133]   The ALJ observed that Dr. Reid stated that Hunt "gave a very believable

presentation."  Dr. Reid also believed that Hunt had a number of physical problems that would

make it very difficult for him to work.[134]   The ALJ noted, however,  that Dr. Reid's opinion was

based almost entirely on Hunt's own subjective reports.  The ALJ conceded that this was not

atypical of an initial psychiatric evaluation.  He noted, however, that "Dr. Reid did not have the

benefit of reviewing the claimant's entire record, as we do."[135]   The ALJ stated that "the record

casts doubt on the claimant's veracity and accuracy of reporting, and undermines the

---

[130]Tr. 40.

[131]Tr. 146.

[132]Tr. 179-86.

[133]Tr. 38 (quoting Dr. Reid's report at tr. 209.).

[134]Tr. 38 (referring to Dr. Reid's opinion at Tr. 209).

[135]Tr. 39.

assumptions upon which Dr. Reid's opinions are based."[136]  The ALJ discounted Dr. Reid's

opinion for the same reasons that he discounted Dr. Djurich's opinion with the additional

consideration that Dr. Reid saw Hunt only one time.[137]  The court also notes that Dr. Reid's

opinion is inconsistent with that of Dr. Hardy, who evaluated Hunt at the request of the agency,[138]

and whose evaluation appears to have  involved at least some testing.[139]  In conclusion, the ALJ

did not err in according Dr. Reid's opinion little weight.

### 3.  Credibility Determination

Hunt argues that the ALJ inconsistently applied his credibility determination, sometimes

using Hunt's self-reports as a basis to discount a medical opinion, and at other times using them

to lend weight to a medical opinion.[140]  For example, the ALJ gave significant weight to the

opinion of Dr. Peterson, noting that the opinion was consistent with Hunt's self-reports.[141]  On

the other hand, he discredited Dr. Reid's report because it was based almost entirely on Hunt's

subjective reports.  Hunt argues that because the ALJ did not provide the specific statements that

he found unreliable, it is impossible for the court to evaluate whether his rationale is logical.

Hunt contends that the case should be remanded for a more specific and clear analysis.[142]

---

[136]Tr. 39.

[137]Tr. 39.

[138]Tr. 175-78.

[139]Tr. 177.

[140]Plaintiff's Brief in Support of Petition for Review (Supporting Brief) at 29-30, docket no. 13, filed June 27, 2008.

[141]Tr. 40.

[142]Tr. 39.

"Credibility determinations are peculiarly the province of the [ALJ]," and will not be disturbed if supported by substantial evidence.[143]  In this case, the ALJ provided an extensive discussion of the reasons for his determination that Hunt was not entirely credible.  The ALJ noted that although the genesis of Hunt's back pain allegedly was his fall into a ditch or well when he was 11 or 12 years old, he worked steadily despite his back injuries until May 2004 when he quit working because of dizziness and sinus problems, as well as an arm injury that had medically healed.[144]  The ALJ further observed that Hunt was able to do part-time work at the trailer court where he lived until June 2004.  This work involved standing, watering, and mowing.[145]  Further, Hunt's back was sufficiently healthy that he was able to go four-wheeling when he injured his back for the fourth time.  The ALJ noted that these injuries apparently did not warrant a trip to the doctor or to the emergency room; and in fact, Hunt could not recall a specific injury.  The ALJ also stated that Hunt did not receive consistent treatment for his back problems until he was no longer able to obtain narcotic pain medications following his sinus surgery in 2003.[146]  In another part of his opinion, the ALJ mentioned the notes from Hunt's visit to the emergency room for sudden low back pain in September 2006.  The ALJ stated the "he was noted to be up and moving around unless he was being observed–a fact that adversely affected his credibility."[147]

---

[143]*Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)(quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)).

[144]Tr. 41.

[145]Tr. 41 (citing tr. 101,  107.)

[146]Tr. 41.

[147]Tr. 29.

The court concludes that the ALJ's explanation regarding his evaluation of Hunt's credibility are more than adequate.  The ALJ's credibility determination is entitled to great deference, and will not be disturbed where, as here, it is supported by substantial evidence.[148] Hunt's arguments concerning the weight of the evidence, and the ALJ's credibility determination, are simply "an invitation to this court to engage in an impermissible reweighing of  the evidence and to substitute [its] judgment for that of the Commissioner, an invitation [the court] must decline."[149]

### 4.  Failure to Follow the Two-Step Analysis in Assessing Medical Opinions

Hunt makes one other argument concerning the adequacy of the ALJ's evaluation of the medical opinions.  As the ALJ observed, in evaluating a medical opinion, he was required to determine whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."[150]  If not, the inquiry is at an end.  If the opinion is well-supported, then the ALJ must determine whether the opinion is consistent with other evidence in the record.[151]  Hunt contends that although the ALJ recognized that he was supposed to first determine whether the opinions were well-supported by clinical and diagnostic techniques, he skipped the first step and went directly to comparing the medical opinions of Dr. Djurich and Dr. Reid to other substantial evidence of record.[152]

---

[148] *Kepler*, 68 F.3d at 391.

[149] *Hackett*, 395 F.3d at 1173.

[150] Tr. 38 (quoting SSR 96-2p).

[151] Tr. 38 (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

[152] Plaintiff's Brief in Support of Petition for Review (Supporting Brief) at 26-29, docket no. 13, filed June 27, 2008; Reply at 8.

While it is true that the ALJ did not set forth his determination regarding whether the medical opinions of Dr. Djurich and Dr. Reid were well-supported by clinical and laboratory diagnostic techniques before weighing the evidence, it is difficult to see how this argument is helpful to Hunt. If the ALJ had determined that the opinions were not well-supported, then the ALJ would have been justified in ending the evaluation at that point. He could have simply rejected the opinions outright. If he found that the opinions were well-supported, he would then have been required to evaluate the opinions against the evidence of record which is exactly what he did. Accordingly, the court finds this criticism of the ALJ's opinion without merit.

## E. Residual Functional Capacity Assessment (RFC)

Hunt offers a rather strange argument that "the ALJ ultimately assigned Mr. Hunt a bizarre RFC that is more restrictive than the record supports absent the opinions of Dr. Djurich, Dr. Reid, and Nurse Cormier."[153] Hunt contends that unless the ALJ actually relied upon the discounted medical opinions, the ALJ's RFC determination is not supported by the evidence of record. He states that the "RFC assessment by the ALJ is *very* restrictive, and detailed, but hardly represents Mr. Hunt's abilities based on the facts of record that the ALJ accepts as valid."[154] Similarly, Hunt states that the ALJ's mental RFC assessment is also more restrictive than that supported by the record evidence accepted by the ALJ.[155] The point of Hunt's argument is apparently that the ALJ's RFC assessment is arbitrary.[156]

---

[153]Plaintiff's Brief in Support of Petition for Review (Supporting Brief) at 33, docket no. 13, filed June 27, 2008.

[154]Supporting Brief at 35.

[155]*Id.* at 39-40; Reply at 3-4.

[156]Reply at 10.

The court notes, however, that even if the ALJ's RFC assessment is more restrictive than the record would support, that would only favor Hunt's claim of disability.  The fact remains that the ALJ's RFC determination was contained in the hypothetical to the VE, who testified that even with this restrictive RFC,  the hypothetical individual would be able to perform jobs that existed in significant numbers in the national economy.  Thus, the VE's testimony provided substantial evidence to support the ALJ's finding that Hunt was capable of performing work that existed in the national economy.[157]

In his reply memorandum, Hunt argues that in making his RFC assessment, the ALJ failed to account for restrictions in the forms filled out by Dr. Djurich and Nurse Practitioner Cormier.  In particular, he points to their statements that Hunt could sit and stand for less than two hours in an eight-hour day, and would need to lie down for at least six hours; and could not function in an environment that set time restraints, required repetitive activities, and did not allow for rest periods.[158]  However, as discussed, the ALJ gave no weight to the opinion of Ms Cormier and little weight to the opinion of Dr. Djurich.  Thus, he was not required to include those restrictions in his RFC assessment.

## F.  Motion to Affirm

The Commissioner filed a Motion to Affirm the Commissioner's Decision in this case.[159]  A motion to affirm the decision of the Commissioner is not proper practice in this district.

---

[157]*Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996); *Ellison v. Sullivan*, 929 F.2d 534, 537 (10th Cir. 1990).

[158]Reply at 4.  Hunt also contends that the ALJ omitted restrictions imposed by Dr. Reid, but Hunt fails to specify those restrictions.

[159]Docket 14, filed July 28, 2008.

Further, the motion does not conform with the instructions provided in the scheduling order in this case.[160]   The court will affirm the Commissioner's decision, but will strike the motion to affirm.

## ORDER

The Commissioner applied the correct legal standards, and his decision is supported by substantial evidence.   Accordingly, the decision of the Commissioner is **AFFIRMED**.

The Commissioner's motion to affirm is **STRICKEN**.[161]

March 27, 2009.

BY THE COURT:

_____
David Nuffer
U.S. Magistrate Judge

---

[160]Docket no. 11, filed May 20, 2008.

[161]Docket 14, filed July 28, 2008.